*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

GREGORY STEVEN BLUNDELL

               Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY

             Defendant.

_____

Case No. 12-cv-6235 (FLW)

**OPINION**:

**WOLFSON, United States District Judge:**

Gregory Steven Blundell ("Plaintiff") appeals from the final decision of the Commissioner of Social Security (the "Commissioner"),[1] denying Plaintiff disability benefits under the Social Security Act ("Act"). Plaintiff contends that the record substantiates his claims that his is disabled, and requires a conclusion that he is entitled to disability insurance benefits. Specifically, Plaintiff maintains that the Administrative Law Judge (the "ALJ") erred in determining that Plaintiff was not totally disabled and could perform certain jobs. After reviewing the administrative record, this Court finds that the ALJ's decision is supported by substantial evidence in the record, and accordingly, affirms the ALJ's decision to deny Plaintiff disability benefits.

## I.     OVERVIEW

### A.     Procedural History

_____

[1]     When Plaintiff originally filed suit, Michael J. Astrue was the Commissioner of Social Security; since then, Carolyn W. Colvin replaced Astrue as the Acting Commissioner of Social Security, and is so substituted as Defendant in this action pursuant to Fed. R. Civ. P. 25(d).

Plaintiff first filed an application for Social Security Disability Benefits and Supplemental Security Income Benefits on June 24, 2009, alleging a disability onset date of January 31, 2009. AR 147-51, 152-58 [2]. Both the initial applications and requests for reconsideration were denied. *Id.* at 94, 96-97. Following a timely request for a hearing, on March 22, 2011, Plaintiff appeared before ALJ Therese A. Hardiman in Wilkes Barre, Pennsylvania. *See id.* at 47-93 (Transcript of Hearing). On April 21, 2011, the ALJ issued an unfavorable decision denying Plaintiff benefits on the basis that Plaintiff was not disabled. *Id.* at 16-31. Plaintiff petitioned the Social Security Appeals Council (the "Appeals Council") for review of the ALJ's decision, which was denied on September 12, 2012. *Id.* at 1-5. Plaintiff subsequently filed the instant action before this Court on October 4, 2012.

**B.     Background**

Plaintiff was born on May 6, 1956, and was 52 years old on the alleged disability onset date. AR 30. Before his disability, Plaintiff had a job, as he had had for substantially his entire career doing marketing work, including research, copywriting, and arranging meetings, conferences, and other activities. *Id.* at 24, 30. Plaintiff contends that he stopped working full time in January 2009, and that his attempts to continue part time work at home were unsuccessful, as a result of lightheadedness, spatial issues, numbness in his hands, difficultly finding words in speech, difficulty working in a timely manner, and general fatigue, lack of energy, and dizziness. *Id.* at 24-25. In sum, Plaintiff claims that he had no energy to do work. *Id.* at 25. In connection with his application for benefits, Plaintiff visited several medical professionals for evaluation of his physical and mental health. I detail the relevant findings of these professionals below.

---

[2]     The facts and procedural history are taken from the administrative record ("AR") submitted with Plaintiff's appeal.

C.    Review of Medical Evidence

1.    Physical Health

On August 4, 2008, Plaintiff, at the referral of his treating physician, Dr. Daryl Kim,[3] visited Dr. Steven Golombek, a rheumatologist. AR 304-307; *see also id.* at 259-60. In his report, Dr. Golombek indicated that Plaintiff had been previously diagnosed with Lyme disease but the disease appeared to have been treated with little lingering effect. *Id.* at 259; *see also id.* at 27, 419. Although Plaintiff complained to Dr. Golombek about numerous symptoms he had had over the previous years – including fatigue, dizziness, and spatial issues – Dr. Golombek's report noted that all previous laboratory tests of Plaintiff were normal, other than a Vitamin D deficiency. *Id.* at 419. Dr. Golombek's own examination revealed that Plaintiff was in overall good health. *Id.* at 259-60. However, Dr. Golombek further identified Plaintiff as having reported ongoing chronic fatigue syndrome ("CFS"). *Id.* at 419-20. Dr. Golombek continued to meet with Plaintiff though at least December 2010, and although many of his handwritten notes for these follow up visits are difficult to decipher, it appears that there was no substantial change in Dr. Golombek's observations or diagnoses of Plaintiff with respect to his Lyme disease, Vitamin D deficiency, or CFS, except for the prescription of the drug Cymbalta. *Id.* at 304-307.

Based on his care of Plaintiff, Dr. Golombek completed a "Doctor's Social Security Medical Report Form" in December 2010, in connection with Plaintiff's disability claims. AR 393. On the form, Dr. Golombek diagnosed Plaintiff with CFS, and he further indicated that, as

---

[3]    Although Dr. Kim is Plaintiff's primary care physician, the vast majority of Dr. Kim's treatment of Plaintiff occurred prior to Plaintiff's disability onset date, and thus is irrelevant in considering the extent of Plaintiff's alleged disability with respect to his eligibility for Social Security benefits. However, I note that Dr. Kim did complete an "Attending Physician Statement," apparently in conjunction with an insurance claim, on April 9, 2009. AR 296-97. In this statement, Dr. Kim diagnosed Plaintiff with CFS, resulting in fatigue and lightheadedness. *Id.* at 296. Notwithstanding this diagnosis, Dr. Kim indicated that his objective findings were "normal exam & labs" and that Plaintiff's Lyme disease and Vitamin D deficiency were treated. *Id.*

a result of this diagnosis, Plaintiff was significantly limited in his ability to do basic work activities, to the extent that Plaintiff would be unable to perform substantial gainful employment. *Id.* In support of his diagnosis, Dr. Golombek indicated that he found Plaintiff's complaints to be credible. *Id.*

In January 2010, Plaintiff visited Dr. Henry Rubenstein for a consultative physical examination at the request of the state agency. *Id.* at 358-59; *see also id.* at 27. Dr. Rubenstein's report noted that Plaintiff had a history of CFS and Lyme disease, although the Lyme disease had been treated satisfactorily. *Id.* at 358. Dr. Rubenstein's observations of Plaintiff's physical exam revealed virtually nothing unusual; he observed that Plaintiff was "alert and oriented, answer[ing] questions in a reasonable manner," had "no difficulty getting on and off the examination table," and that his "[r]ange of motion and muscle strength in the upper and lower extremities [was] normal." *Id.* at 358-59. Overall, Dr. Rubenstein indicated no physical issues with Plaintiff other than his CFS. *Id.* at 359.

## 2. Mental Health

On July 28, 2009, Dr. Joel E. Morgan, a neuropsychologist, performed a psychiatric evaluation on Plaintiff as the request of his insurance carrier. AR 308-317. In his evaluation report, Dr. Morgan noted that during the examination, Plaintiff "presented as a neatly and casually dressed male, looking somewhat younger than his stated age of 53." *Id.* at 311. Dr. Morgan further observed that Plaintiff "presented in a forthright and clear manner and was a relatively good historian . . . [and] his speech was relevant and coherent; however he was quite tangential and at times had difficultly expressing his thoughts in a forthright manner." *Id.* Nevertheless, Dr. Morgan perceived "no suggestion of an underlying thought disorder or any departures from normal reality testing." *Id.* Apart from general nervousness associated with the

testing procedure, "psychotic symptoms were not appreciated or reported," and Plaintiff "did not exhibit any overt evidence of clear neurological symptoms, such as gait disturbance, difficulties with coordination, balance, hemiparesis aphasia or other frank neurological symptoms." *Id.* In connection with the validity of his symptoms, Plaintiff scored within the normal range, representing a "valid profile" with "no evidence of exaggerating, feigning or malingering." *Id.* at 312. With respect to the results of intelligence testing, Dr. Morgan explained that Plaintiff had "average intellectual functioning with intact visual and verbal memory abilities," and that his "executive functions, language and visual-perceptual abilities are normal," but that Plaintiff's "processing speed and fine-motor dexterity are lower than expected." *Id.* at 314.

Turning to Plaintiff's emotional and personality aspects, Dr. Morgan noted that Plaintiff consistently self-reported several issues, including malaise, gastrointestinal complaints, and mild social avoidance. *Id.* Dr. Morgan identified these symptoms as consistent with mild depression, but noted that Plaintiff repeatedly denied any depression and instead attributed his complaints to CFS. *Id.*

In responding to specific questions set forth by the insurance carrier, Dr. Morgan explained, *inter alia*, that Plaintiff "report[ed] a desire to return to work." *Id.* at 315. Dr. Morgan noted that his "neurocognitive profile indicates average to above average functioning," but nevertheless Plaintiff's "weakness in processing speed . . . may make it difficult for him to perform his required duties as quickly as necessary." *Id.* Moreover, Dr. Morgan concluded that the test results "indicate the presence of preoccupation with somatic complaints, which is consistent with the diagnosis of CFS," and that based on Plaintiff's "diagnosis of CFS, he may also require a flexible schedule that includes tel-commuting or a truncated work day." Finally, Dr. Morgan explained that "individuals diagnosed with CFS commonly find improvement with a

combination of pharmacological and psychotherapeutic approaches," and recommended that Plaintiff seek such treatment. *Id.*[4]

Plaintiff submitted to another neurological evaluation on January 19, 2010, by Dr. Wilfred van Gorp, Ph.D, a neuropsychologist. *See* AR 348-57. Following extensive examination and testing, Dr. Gorp determined that Plaintiff had "consistently slow speed of information processing, lower than expected memory performance, and difficulty on a test of judgment." *Id.* at 352. Dr. Gorp further explained that despite Plaintiff's "high score on an untimed test resistant to decline following an illness or injury, other test scores reflect [l]ow [a]verage or below performance on measures of speed processing." *Id.* In noting other variations among Plaintiff's neurological test scores, Dr. Gorp stated that "these discrepancies most likely reflect sequelae to his CFS diagnosis and represent barriers to returning to work." Dr. Gorb concluded that Plaintiff "is a man whose work imposed demands for rapid and efficient performance" and that his current test results indicate that Plaintiff "will be unable to fulfill these demands as he had in the past." *Id.*

On February 24, 2010, Plaintiff, at his counsel's request, underwent a third neurological evaluation by Dr. Benjamin H. Natelson, M.D., a neurologist. In a two-page letter, Dr. Natelson summarized his findings based on Plaintiff's reported symptoms and medical history; Dr. Natelson did not perform independent psychological testing on Plaintiff. *See* AR 360-61. In his letter, Dr. Natelson indicated that Plaintiff was diagnosed with Lyme disease in 2005, from which he recovered following treatment, and that in 2008, Plaintiff was diagnosed with CFS. *Id.* at 360. Dr. Natelson noted that Plaintiff reported low activity levels and several other symptoms

---

[4]    In a letter dated August 31, 2009, Dr. Howard J. Oakes, Psy.D., reviewed Dr. Morgan's report at the request of Plaintiff's insurance carrier. Dr. Oakes found no errors in Dr. Morgan's methodology or conclusions. *See* AR 319-20.

consistent with a diagnosis of "more severe" CFS. *Id.* With respect to Plaintiff's past medical history, Dr. Natelson determined both his psychiatric and physical diagnoses were largely normal, but did note that Plaintiff was a thoracic breather, which could contribute to his CFS symptoms. *Id.* Dr. Natelson then observed that, in his opinion, the previous analysis of Plaintiff's illness was "limited" and that Plaintiff's "symptom severity is certainly great enough to explain his inability to work." *Id.* at 316. Dr. Natelson further concluded that he believed Plaintiff to be "100% disabled," could "not fulfill his former duties as an executive," and could not "work 8 hour [*sic*] in simple, sedentary job—without the ability to remove himself from the workplace to rest." *Id.*

### D. Testimonial Record

### 1. Plaintiff's Testimony

Plaintiff appeared with counsel and testified at a hearing before the ALJ on March 22, 2011. In general, Plaintiff testified that he stopped full-time work in January 2009, and all work in March 2009. AR 54. Since then, Plaintiff testified that he continues to take care of his own personal grooming, does some household chores, goes shopping with his wife. AR 55. Plaintiff further testified that he lives in a two-story house, going up the stairs on average five to six times a day; he further explained that he could lift about 25 pounds, and had full range of motion in his extremities. AR 56. Plaintiff testified that he could not stand long before he had to sit, could only sit for about 15 to 20 minutes before he had to stand, and could walk at least a hundred feet. AR 57. With respect to medication, Plaintiff testified that he had prescriptions from Dr. Golumbek for a sleeping medication, a Xanax derivative, and pain medication. AR 57-58. Plaintiff explained he did not experience any side effects from his medications other than weight gain, but that it was possible that these medications could aggravate his other symptoms. AR 58-

59.

In response to questioning from counsel, Plaintiff testified that his previous employment was as a marketing researcher. AR 59. In that position, Plaintiff stated that he would organize marketing campaigns, including writing copy for brochures, convening conferences, and dealing directly with clients and vendors on marketing matters. AR 59. Plaintiff testified that he progressed in his career to the point of becoming a partner or part owner of the company for which he worked. AR 60. However, Plaintiff explained that he began to experience difficulties with his personal and work life following a diagnosis of Lyme disease in 2005. AR 61-62. Specifically, during the relevant alleged disability onset period beginning in January 2009, Plaintiff testified that he (1) could only drive short distances, (2) had spatial issues and dizziness, (3) had no energy and felt tired, (4) experienced lightheadedness, (5) had difficulty articulating his thoughts orally, (6) had problems finding the right word for his copy writing at work, and (7) had general feelings of malaise that ebbed and flowed. AR 64-70. In general, Plaintiff testified that he feels fatigue and pain, such as headaches, any time he is required to do an activity for over 10 minutes, and that he almost always experiences a "crash" following the activity that results in increased pain in his head and upper body. AR 72-73. Plaintiff also explained that he no longer could read or write much because of his difficulties concentrating on traditional paper, but that he could read for up to 15 minutes, especially if it was on a computer screen. AR 75-77.

When questioned about his ability to engage in work, Plaintiff set forth several reasons why he could no longer complete what was required of him at his previous job. For example, Plaintiff testified that he was no longer able to conduct research, have a meaningful conversation with coworkers or clients, meet deadlines by virtue of taking time off for his illness, or engage in any activity requiring concentration for more than 10 minutes. *See* AR 77-83.

With respect to medical care, Plaintiff testified that he was not receiving psychological care or counseling, and that he had not visited the emergency room any time during the six months prior to the hearing. AR 54. However, Plaintiff stated that he visited Dr. van Gorp in January 2010 for nearly a full day of psychological testing and evaluation. AR 70-72. Plaintiff testified that following this testing, he learned that his previous IQ score of approximately 135 was now at 108. AR 74-75. Plaintiff further explained that the cognitive problems identified by Dr. van Gorp are always present, but that they vary in intensity. AR 75.

### 2.    Vocational Expert Testimony

Josephine Doherty, an independent vocational expert, also testified at the hearing. AR 88. Ms. Doherty explained that she had reviewed the documentary record in the matter and was prepared to testify. AR 88. Ms. Doherty summarized Plaintiff's vocational profile, identifying that Plaintiff was at an advanced vocational age, has 16 years of education, and had worked previously in marketing research, which was a skilled, sedentary position. AR 88-89. Ms. Doherty also noted that Plaintiff had skills transferrable to the semi-skilled level, such as advertising clerk positions. AR 89.

Particularly pertinent to this appeal are several hypotheticals posed by the ALJ and answered by the vocational expert.[5] First, the ALJ asked Ms. Doherty to assume a hypothetical individual with the vocational profile of Plaintiff, including past work experience, and

> assume further that this individual retains the capacity to perform any—all exertional levels, there is no exertional limitations, however there are the following non-exertional limitations: the individual should not be on ladders; and should avoid hazards, which would include heights and moving machinery; and the individual would be limited to simple, routine tasks; and low stress as defined as only occasional decision making required; and only occasional changes in the work setting; could such an individual perform any of the past relevant work of

---

[5]    Plaintiff's counsel did not pose any hypotheticals or challenge the ALJ's hypotheticals at the hearing.

[Plaintiff]?

AR 89.  In response, Ms. Doherty testified that such an individual would not be able to perform Plaintiff's past relevant work.  AR 89.  When the ALJ asked if such an individual could perform any other job in the regional or national economy, however, the vocational expert answered in the affirmative.  AR 89-90.  Ms. Doherty testified that an individual fitting the ALJ's profile could be a "light duty unskilled position as a photocopying machine clerk," and that more than 1,300 such jobs existed in Pennsylvania, and more than 98,000 such jobs existed in the national economy.  AR 90.  Ms. Doherty also testified that other appropriate light duty, unskilled jobs could be as a "digital processor" or a "retail marker," with over 64,000 and 44,000 positions, respectively, for each.  AR 90.

The ALJ then imposed additional limitations on the same individual from the previous hypothetical, that the individual also should not be required "to read anything that would take longer than 15 minutes to read at a time" or  "to respond orally to perform job functions."  AR 90-91.  Ms. Doherty responded in her testimony that such an individual would not be capable of performing Plaintiff's past relevant work, but that such an individual would still be capable of performing the previously identified light duty, unskilled jobs, as those jobs do not require prolonged reading or use of oral skills.  AR 91.

The ALJ continued the inquiry of the vocational expert by imposing several more limitations on the same individual form the previous hypotheticals.  Specifically, the ALJ added the restrictions that the hypothetical individual may require breaks in excess of the normal two per day plus lunch, and/or may require unscheduled breaks of varying lengths throughout the day, and/or may be expected to be absent in excess of three times per month, and/or may be expected to be off task 30 percent of the day.  AR 91.  Ms. Doherty responded that such an

individual would not be able to perform Plaintiff's past job or any other job in the national economy.

E.    The ALJ's Findings

In a decision dated April 21, 2011, the ALJ initially determined that Plaintiff met the insured status requirements of the Social Security Act, and would continue to meet them through December 31, 2013.  AR 21.  After reviewing the record and applying the relevant law, the ALJ determined that Plaintiff was not under a disability within the meaning of the Social Security Act during the applicable disability period.  AR 21.

In reaching this conclusion, the ALJ applied the standard five-step evaluation process to determine if Plaintiff satisfied her burden of establishing disability.[6]  AR 21-30.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period beginning from his alleged onset date of January 31, 2009.[7]  AR 21.  At step two, the ALJ found that Plaintiff had the following severe impairments: CFS, depressive disorder, and cognitive disorder.  AR 21.  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the SSA that would automatically find Plaintiff disabled.  AR 21-22.  At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: the Plaintiff should never climb on ladders; should avoid hazards, including heights and moving machinery; should not be required to read more than 15 minutes at time or respond orally to perform job functions; and should be limited to simple, routines tasks and low stress, defined as only

_____

[6]    *See infra* Part II.B.
[7]    The ALJ noted that Plaintiff had continued to work after the alleged disability onset date but that this part-time work activity did not rise to the level of substantial gainful activity.  AR 21.

occasional decision making and changes in the work setting. AR 23. The ALJ made her findings by stating that they were consistent with the objective medical evidence and other evidence in the record, and that Plaintiff's and his wife's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment. AR 24-25. Specifically, the ALJ noted the findings of Dr. Morgan and Dr. Oakes did not identify any psychiatric and/or cognitive impairment, with no resulting restrictions or limitations. AR 26. Similarly, the ALJ noted that Dr. van Gorp's[8] evaluation did not reveal that Plaintiff's cognitive deficits were increasing with time, but that Dr. van Gorp did indicate that Plaintiff's symptoms and history were consistent with a diagnosis of a cognitive disorder, not otherwise specified, and CFS. AR 26. Overall, the ALJ noted that there was nothing in testing to suggest any mental limitation greater than moderate, giving great weight to both the disability determination service assessment and the global assessment of functioning ("GAF") score. AR 26-27. Furthermore, the ALJ gave particular weight to Dr. van Gorp's finding that Plaintiff would likely be unable to satisfy the requirements of his previously held job, noting that this finding was consistent with the record as a whole. AR 27. The ALJ also considered the relevant treating records of Plaintiff's physicians, Dr. Kim and Dr. Golumbek, but found that it was difficult to decipher many of their handwritten notes and, to the extent the records were legible, they contained no significant adverse physical findings or objective deficits. AR 27. Similarly, the ALJ explained that little weight was given to Dr. Natelson's conclusion that Plaintiff was "100% disabled" because the objective findings upon which this conclusion was based were normal, other than Plaintiff's thoracic breathing, and the disability determination is reserved to the Commissioner. AR 27-28. The ALJ likewise

---

[8]       The ALJ's decision misidentifies "Dr. von Gorp."

determined that Dr. Golumbek's opinion that Plaintiff was unable to perform any substantial gainful employment as a result of his CFS was inconsistent with the objective record evidence, including Dr. Golumbek's own findings. AR 28. In sum, the ALJ noted that other than Plaintiff's subjective complaints, there was absolutely no objective medical evidence, including test results, that supported a finding that Plaintiff was wholly disabled; the ALJ explained that a diagnosis of CFS, alone, without evidence of actual impairments, was insufficient to support Plaintiff's claim of being incapacitated. AR 28-29.

In light of the RFC assessment, and based on the testimony of the vocational expert, the ALJ determined that Plaintiff could not perform his past relevant work as a marketing researcher. AR 29-30. The ALJ further noted that Plaintiff was closely approaching advanced age on the alleged disability onset date, had at least a high school education, was able to communicate in English, and had acquired skills from his past relevant work that would transfer to other positions, such as an advertising clerk. AR 30. After posing several hypotheticals to the vocation expert that tracked Plaintiff's RFC, the ALJ found that Plaintiff could perform other occupations with jobs existing in significant numbers in the national economy. AR 30. Specifically, he ALJ accepted the vocational expert's testimony that Plaintiff could perform the jobs of a photo copy machine clerk, digital processor, and retail marker, and that sufficient positions for each of these jobs existed in the country. AR 30. Based on these findings, the ALJ further found that Plaintiff was "not disabled" under the SSA, and denied Plaintiff benefits for disability and disability insurance benefits and for supplemental security income. AR 31.

## II.     DISCUSSION

### A.     Standard of Review

On a review of a final decision of the Commissioner, a district court "shall have power to

enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

> **B.     Standard for Entitlement of Benefits**

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42

U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Eligibility for supplemental security income requires the same showing of disability.  *Id.* § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id.*  A claimant who does not have a severe impairment is not considered disabled.  *Id.* § 404.1520(c); *see Plummer*, 186 F.3d at 428.  Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F .R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and

is automatically entitled to benefits. *See id.* § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

**C.     Plaintiff's Arguments**

On appeal, Plaintiff raises four challenges to the ALJ's decision: (1) the ALJ failed to recognize, at step two, that Plaintiff's Lyme disease was a severe impairment;[9] (2) the ALJ incorrectly determined in step three that Plaintiff did not meet or equal one of the impairments on the Impairment List; (2) the RFC determination at step four was not supported by the record, including Plaintiff's testimony; and (3) because the ALJ's RFC failed to account for certain physical or mental limitations that were credibly established by the record, these limitations were not conveyed to the vocational expert in the hypothetical questions during step five.[10] *See* Pl. Br. at 16, 23, 28. In that connection, I note that Plaintiff bears the burden of proving disability at steps two, three, and four, but once the analysis proceeds to step five, the Commissioner bears the burden of showing that Plaintiff cannot perform any substantial gainful activity in the national economy. *See Wallace v. Sec'y of Health and Human Svcs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).

### 1. Step Two Determination

At step two, the ALJ found that Plaintiff had the following severe impairments: CFS, depressive disorder, and cognitive disorder. AR 21. The ALJ noted that Plaintiff's medical records indicated that Plaintiff had a history of Lyme disease, but that these same records further identified the disease as having been "adequately treated," and as of August 10, 2008, there had been "no signs of other active process." AR 21. Based on this evidence, the ALJ determined

---

[9] Plaintiff also argues that the ALJ failed to account for Plaintiff's depression as a severe impairment. However, as the Commissioner correctly points out, the ALJ specifically identified "depressive disorder" as one of Plaintiff's severe impairments. AR 21; *see also infra*, Part II.C.1.

[10] In that connection, I note that the ALJ clearly found—and the Commissioner does not dispute—that Plaintiff could not perform his previous work in light of the ALJ's RFC determination. Thus, the only issue on this appeal is whether the Commissioner adequately carried her burden at step five to show that Plaintiff was not disabled within the meaning of the Act.

that there was "no current evidence that [Plaintiff] has active Lyme disease nor is there evidence that he is being treated for the same," and accordingly, "there is no medically determinable severe Lyme disease impairment." AR 22.

Plaintiff argues that the ALJ incorrectly concluded that Plaintiff's Lyme disease was not a severe impairment. Pl. Br., 17-20. In that connection, Plaintiff asserts that the ALJ looked only at certain medical records predating the alleged disability onset date, and failed to consider medical evidence documenting the diagnosis and treatment of Plaintiff's Lyme disease after the alleged disability onset date of January 31, 2009. *See id.* In finding that Plaintiff's Lyme disease was not severe, the ALJ pointed to test results from 2006 and 2008 that were equivocal or negative for Lyme disease. AR 21-22. Plaintiff contends that not only do these tests predate the alleged disability onset date, but that testing from May 21 and August 29, 2009, which was not cited by the ALJ, showed positive for Lyme disease. Pl. Br., 18. To begin, review of these records reveals testing for Lyme disease only on the May 21, 2009 date. *Compare* AR 437 (May 21, 2009) *with id.* at 446-48 (Aug. 29, 2009). The May 21 test results are also not as definitive as Plaintiff contends—the lab results show "positive abnormal" for "Lyme IgG WB Interp.," but "negative" for "Lyme IgM WB Interp." *Id.* at 437. These results are consistent with the findings in the ALJ's decision based on Plaintiff's earlier records, and Plaintiff fails to supply any medical evidence that the ALJ incorrectly interpreted those results. *See id.* at 22. Indeed, Plaintiff points to no medical evidence to support a claim that the more recent test results support a finding of severe impairment; nowhere does Plaintiff cite a diagnosis by a treating physician that the presence of Lyme disease caused any impairment after the alleged disability onset date. Rather, as the ALJ correctly noted in the decision, the objective medical evidence showed that Plaintiff's Lyme disease was treated as of 2008, *see, e.g.*, *id.* at 296 (records of Dr. Kim noting

Lyme disease as "treated"), and no contrary findings appear in Plaintiff's treating physicians' records after that date. *See, e.g.*, *id.* at 326-31 (diagnosis of Lyme disease absent from records of Dr. Golombek from March to October 2009).

Finally, even assuming *arguendo* that these more recent records are relevant to determining Plaintiff's impairments, the fact that the ALJ found that Plaintiff's Lyme disease was not a severe impairment is not reversible error; the ALJ ultimately proceeded beyond the step two analysis based on a finding that Plaintiff had other severe impairments. *See, e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

### 2. Step Three Determination

At step three, the ALJ concluded, after review the medical record and Plaintiff's testimony, that none of Plaintiff's impairments met or medically equaled any one of the impairments on the Impairment List. AR 22; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. First, the ALJ noted that Plaintiff's CFS was not specifically listed on the Impairment List, and thus "disability cannot be presumed solely on that diagnosis." AR 22. Furthermore, the ALJ explained that she considered Plaintiff's CFS in combination with Plaintiff's other impairments and concluded that Plaintiff could not be considered disabled on the medical factors alone. AR 22.

Similarly, the ALJ analyzed Plaintiff's mental impairments both singularly and in combination, and still concluded that Plaintiff's impairments did not meet or equal those under Listings 12.02 and 12.04. AR 22-23; *see also* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.02 & 1204. Specifically, the ALJ determined that Plaintiff's mental impairments did not meet or equal

the criteria under either Paragraph B or Paragraph C of Listings 12.02 and 12.04.[11] AR 22. In analyzing Plaintiff's impairments under Paragraph B, the ALJ noted that the criteria of a marked limitation means something more than moderate but less than extreme. AR 22. The ALJ then found that in activities of daily living and social function, Plaintiff has no restrictions; Plaintiff himself testified that he provides for his own personal care and is able to go shopping with his wife and drive his son to school. AR 23. Similarly, Plaintiff did not have any reported or documented episodes of decompensation of extended duration. AR 23. The ALJ did find that Plaintiff has moderate difficulties with regard to concentration, persistence, or pace. AR 23. The ALJ determined that Plaintiff did not meet the criteria of Paragraph B because it requires the existence of two marked limitations. AR 23. With respect to the Paragraph C criteria, the ALJ noted that that the record was devoid of any medically documented chronic organic mental disorder or chronic affective disorder of at least two years' duration. AR 23. Thus, the ALJ concluded that the Paragraph C criteria were not satisfied either. AR 23.

In his brief, Plaintiff argues that the ALJ erred because CFS can, and in this case should, constitute a disabling impairment. Plaintiff further argues that the ALJ failed to address Listing 12.02A(7). This latter claim is readily disposed of, as Plaintiff does not challenge the ALJ's

---

[11]     Paragraph B of both Listings 12.02 and 12.04 require that Plaintiff demonstrate that his mental impairments result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.02 & 1204. Paragraph C of Listings 12.02 and 12.04 requires a medically documented chronic organic mental disorder or chronic affective mental disorder, respectively, of at least two years' duration, with at least one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.* § 1202.

findings under that Plaintiff did not meet Paragraphs B or C of Listing 12.02. It is therefore irrelevant whether Plaintiff's symptoms met 12.02A(7) because in order to satisfy the criteria of Listing 12.02, Plaintiff had to prove he met the criteria of 12.02(A)(7) *and* Paragraph B. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.02.

With respect to whether a diagnosis CFS should be presumed disabling at step two, Plaintiff relies on the Program Operations Manual System ("POMS") DI 24575.005,[12] and Social Security Ruling ("SSR") 99-2p, and argues that the ALJ's failure to explicitly consider these sources is reversible error. *See* Pl. Br. at 23-26. According to Plaintiff, POMS explains that for CFS, "[p]hysical examination may be within normal limits," and thus the ALJ must consider the "totality of the evidence" to determine whether a claimant has a severe impairment due to CFS. Plaintiff further relies on POMS and SSR 99-2p as setting forth the specific examples of medical signs and laboratory findings that establish the existence of CFS. It is Plaintiff's contention that remand is necessary for the ALJ to apply the instructions in POMS and SSR 99-2p to the objective medical evidence in Plaintiff's record.

Plaintiff's argument fails, however, because nothing in POMS or SSR 99-2p mandates a finding that CFS is *per se* disabling at step three; rather both of these sources direct the ALJ to

---

[12]    POMS is "the publicly available operating instructions for processing Social Security claims." *Wash. Dept. of Social Servs. v. Keffeler*, 537 U.S. 371, 385 (2003). "While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect." *Id.*; *see also Artz v. Barnhart*, 330 F.3d 170, 176 (3d Cir. 2003).

Here, the Commissioner argues that POMS DI 24575.005 is no longer in effect, having been "superseded" by SSR 99-2p. Comm'r Br., 14. Review of POMS online reveals no listing DI 24575.005. *See* SSA's Policy Information Site, *available at* https://secure.ssa.gov/apps10/. However, SSR 99-2p was adopted in 1999, and courts well after then continue to reference DI 24575.005. *See, e.g.*, *Alderson v. Astrue*, No. C09-5081BHS, 2009 WL 3245416, at *6 (W.D. Wash. Oct. 6, 2009); *Mitchell v. Astrue*, No. CIV. 07-5137, 2008 WL 821846, at *2 (W.D. Ark. Mar. 26, 2008). Moreover, the POMS online system does not provide any indication of when DI 24575.005 was repealed. I need not determine the applicability of DI 24575.005, however, because it does not affect my analysis for the reasons explained above.

consider the "onset, duration, severity and residual functional capacity *following the sequential evaluation process*." POMS DI 24575.005 (emphasis added); SSR 99-2p ("Inasmuch as CFS is not a listed impairment [at step three], an individual with CFS alone cannot be found to have an impairment that meets the requirements of a listed impairment; however, the specific findings in each case should be compared to any pertinent listing to determine whether medical equivalence may exist."); *see also Snedeker v. Comm'r of Soc. Sec.*, 244 F. App'x 470, 473 (3d Cir. 2007) ("SSR 99–2p reconfirms that a disability claim involving CFS is evaluated 'using the sequential evaluation process, just as for any other impairment.'"). As explained in more detail *infra*, Part II.C.3, in connection with the ALJ's RFC determination, the ALJ properly considered and weighed the objective medical evidence as well as Plaintiff's own testimony of symptoms in determining whether Plaintiff's severe impairments, including his CFS, rendered Plaintiff totally disabled, and generally appears to have followed the procedure set forth in SSR 99-2p. Indeed, Plaintiff points to nothing in POMS DI 24575.005 or SSR 99-2p mandating that the ALJ find Plaintiff *per se* disabled at step three based on the record evidence in this case. *Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003) ("While it is true that the ALJ's written opinion does not cite to Social Security Ruling 99-2p, we are not aware of any duty which requires ALJs to specifically mention relevant Social Security Rulings when rendering a decision on an individual's claim for Social Security benefits. More importantly, the ALJ's analysis by and large comported with the approach set forth in Social Security Ruling 99-2p."). Accordingly, I reject Plaintiff's argument that the ALJ erred in not finding Plaintiff *per se* disabled.

### 3. Step 4 RFC Determination

At step four, the ALJ determined Plaintiff had the RFC

to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should never climb on ladders; should

avoid hazards, including heights and moving machinery; requires a job that
neither requires the claimant to read for than 15 minutes at a time nor requires the
claimant to orally respond to perform job functions; and is limited to simple
routine tasks and low stress as defined as only occasional decision making and
only occasional changes in the work setting.

AR 23. Plaintiff challenges each of these findings, contending that the ALJ's RFC determination

was not based on substantial evidence in the record. Pl. Br. at 17-23, 29. Specifically, Plaintiff

argues that the ALJ (1) failed to give proper credence and weight to Plaintiff's testimony and

Plaintiff's wife's statements regarding the severity of his impairments, and (2) incorrectly found

that Plaintiff could perform at all exertional levels.

In making a residual functional capacity determination, the ALJ must consider all

evidence before her. *See Plummer v. Apfel*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 29

(3d Cir. 1986). Although the ALJ may weigh the credibility of the evidence, she must give some

indication of the evidence which she rejects and her reason(s) for discounting such evidence. *See*

*Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642

F.2d 700, 705 (3d Cir. 1981). In *Burnett*, the Third Circuit determined that the ALJ had not met

his responsibilities because he "fail[ed] to consider and explain his reasons for discounting all of

the pertinent evidence before him in making his residual functional capacity determination." 220

F.3d at 121. "In the absence of such an indication, the reviewing court cannot tell if significant

probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Similar to the

medical reports, the ALJ must also consider and weigh all of the non-medical evidence before

him. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983); *Cotter*, 642 F.2d at 707. A

claimant's allegations of pain and other subjective symptoms are to be considered, *see Hartranft*

*v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529), and, if they are

consistent with objective medical evidence but the ALJ rejects such allegations, the ALJ must

provide an explanation for doing so. *See Van Horn*, 717 F.2d at 873. Finally, the ALJ may also consider factors such as the claimant's daily activities, measures the claimant uses to treat pain or symptoms, and credibility. 20 C.F.R. § 416.929(c)(3); *see also Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981).

Plaintiff's first argument is that, in fashioning the RFC assessment, the ALJ improperly discounted Plaintiff's subjective complaints, as well as corroborating statements made by his wife. In setting forth Plaintiff's RFC, the ALJ relied on the objective medical evidence of several of Plaintiff's treating physicians. *See supra* Part I.E. The ALJ cited the psychological treating records of Dr. Morgan and Dr. van Gorp, and Dr. Natelson as well as the records from Plaintiff's primary treating physician, Dr. Kim, his treating rheumatologist, Dr. Golumbek, and the state agency consultative physician, Dr. Rubenstein. *See* AR 25-28. In reviewing these records, the ALJ came to the conclusion that the objective medical evidence supported Plaintiff's diagnosis of CFS; however, the ALJ found that there was no clinical or laboratory evidence to support Plaintiff's claims regarding physical deficits. *See id.* at 27-28. Rather, the ALJ explained that the record evidence as a whole showed that Plaintiff had "slow speed of processing, inefficient memory, and a borderline score on a test of judgment," and that these deficiencies would be incorporated into the RFC. *Id.* at 27. On the other hand, the ALJ rejected the conclusions of Dr. Golumbek and Dr. Natelson that Plaintiff was totally disabled as contradicted by the objective findings in the record. *Id.* at 28. Indeed, the ALJ concluded that "with the exception of [Plaintiff's] subjective complaint there is *absolutely no objective evidence of any severe impairment, no objective findings of any functional physical exertional limitations, and no evidence that any physical condition actually causes [Plaintiff] any limitation in his ability to perform work related functions.*" *Id.* at 28 (emphasis added). In sum, the ALJ

determined that the evidence reasonably supported the finding that Plaintiff's CFS and other medically determinable impairments could cause Plaintiff's alleged symptoms, but rejected the Plaintiff's testimony and his wife's statements on the intensity, persistence, and limiting effects of these symptoms to the extent they were inconsistent with the record evidence. *Id.* at 25.

Plaintiff has pointed to no evidence that the ALJ failed to consider in reaching the RFC assessment. Instead, Plaintiff merely argues that it was error for the ALJ to discount Plaintiff's testimony and his wife's statements because they were entitled to "substantial credibility." The Third Circuit has explained that an ALJ may reject a claimant's subjective testimony if she does not find it credible so long as she explains why she is rejecting the testimony. *Schaudeck v. Comm'r of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999). Contrary to Plaintiff's position, great weight is given to a claimant's subjective testimony *only* when it is supported by competent medical evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir. 1979). Here, the ALJ noted that Plaintiff testified "about an amazing assortment of limitations because of his chronic fatigue syndrome." AR 29. Nevertheless, the ALJ explained that there was simply no objective medical evidence to support the severity of Plaintiff's complaints. For example, the ALJ noted that all physical examinations of Plaintiff revealed no exertional limitations. *See, e.g.*, AR 27 (citing Dr. Rubenstein's examination records, who found that Plaintiff had "no difficulty getting on and off the examination table," that his "[r]ange of motion and muscle strength in the upper and lower extremities [was] normal," and, overall, that Plaintiff has no physical issues other than his CFS). Plaintiff points to no evidence in the record, other than his own testimony, to contradict this finding. Similarly, although Plaintiff relies on the reports of Dr. Natelson and Dr. Golumbek finding Plaintiff to be totally disabled, the ALJ correctly gave little weight to these

diagnoses as not being based on the objective medical evidence.[13]  *See Plummer v. Apfel*, 186

F.3d at 429 (explaining that ALJ may reject treating physician's opinion if contradictory medical

evidence exists and ALJ explains reasons for so doing); *see also Stehman v. Comm'r of Soc.*

*Sec.*, 216 F. App'x 249, 252 (3d Cir. 2007) ("We have recognized that an ALJ may afford more

or less weight to an opinion based on who the practitioner is and the extent of the supporting

medical evidence." (Citing *Plummer*, 186 F.3d at 429; *Newhouse v. Heckler*, 753 F.2d 283, 286

(3d Cir. 1985))).

Thus, because Plaintiff's testimony and his wife's statements regarding the severity of his

impairment were not supported by competent medical evidence, it was not error for the ALJ to

afford them little weight.  *See Snedeker v. Comm'r of Soc. Sec.*, 244 F. App'x 470, 474 (3d Cir.

2007) (even in case where claimant had a severe impairment of CFS, special consideration of

claimant's testimony not warranted if not supported by competent medical evidence); *Holiday v.*

*Barnhart*, 76 F. App'x at 482 (finding no error in ALJ giving little weight to claimant's

testimony regarding severity of CFS impairment where testimony not supported by the record);

*see also Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) ("[S]ubjective complaints of

pain, without more, do not in themselves constitute disability.").  Similarly, with respect to

Plaintiffs' second challenge to the RFC determination, it was not error for the ALJ to find that

Plaintiff could perform at all exertional levels; there was ample evidence in the record supporting

the ALJ's decision, and the only contrary evidence regarding exertional capacity comes from

Plaintiff's own testimony.

---

[13]      The ALJ further correctly noted that a finding of disability, for the purpose of social
security benefits, is restricted to the Commissioner; a doctor's finding of disability does not
control.  *Griffin v. Comm'r Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir.  2009) ("The determination
of disability is a conclusion of law for the Commissioner; a physician's statement that a claimant
is 'disabled' or 'unable to work' does not mean that we will determine that [the claimant] is
disabled." (Quoting 20 C.F.R. § 404.1527(e)(1))).

## 5. Step 5 Vocational Expert Questioning

Plaintiff lastly asserts that the ALJ erred during step five by failing to account for all of Plaintiff's impairments in the hypothetical questions posed to the vocational expert, Josephine Doherty. Pl. Br. at 22-26. Specifically, Plaintiff contends that hypothetically questioning failed to account for the following impairments or deficiencies: (1) the ability to walk only about 100 feet at a time, sit for about 15 to 20 minutes at a time, and inability to stand for long periods of time; (2) the peripheral neuropathy in Plaintiffs' hands, described as a burning sensation and/or numbness; (3) the extreme fatigue, limiting Plaintiff's ability to perform any activity for more than 10 minutes at a time; (4) shortness of breath upon exertion; and (5) frequent days where Plaintiff cannot get out of bed. Pl. Br. at 30. Review of the record, however, reveals that these impairments are found solely in Plaintiff's testimony; Plaintiff points to no objective medical evidence other than his own testimony supporting any of these claimed impairments. Because I have already determined that the ALJ's RFC determination is supported by substantial evidence of the record, and the ALJ properly excluded Plaintiff's subjective complaints from the RFC, it was not error for the ALJ to also exclude these complaints from the hypothetical questions posed to the vocational expert.[14] *See Johnson v. Comm'r*, 529 F.3d 198, 206 (3d Cir. 2008) (holding that hypothetical questions must reflect those impairments actually supported by the record). As

---

[14] In that connection, I note that the ALJ imposed an additional, final, hypothetical to the vocational expert that included restrictions permitting the hypothetical individual to take multiple, unscheduled breaks throughout the workday and occasionally be absent from work. *See supra*, Part I.D.2. In response to this hypothetical, the vocational expert opined that such an individual could not engage in any substantial, gainful work in the national economy. Although not directly raised by Plaintiff, I nevertheless discern no error in the ALJ imposing but subsequently disregarding this final hypothetical and the vocational expert's response; the ALJ ultimately determined that the credible, objective medical evidence did not support the restrictions imposed in this last hypothetical. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (ALJ only required to submit to vocational expert those impairments that are medically established).

Plaintiff raises no other challenge to the step five analysis, I find that Plaintiff has failed to demonstrate that the ALJ erred in this regard.

**CONCLUSION**

For the reasons set forth above, the ALJ's decision is AFFIRMED.

An appropriate Order shall follow.


Dated:  October 24, 2013                                    /s/ Freda L. Wolfson
                                                                    Freda L. Wolfson, U.S.D.J.